**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GARY WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16-CV-00258 JAR |
| | ) | |
| RUTH LEWIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment. (Doc. No. 28) The motion is fully briefed and ready for disposition.[1]

### I.      Background

Plaintiff Gary Williams ("Plaintiff") brings this action under 42 U.S.C. § 1983 against Defendants Ruth Lewis ("Lewis"), Phyllis Berkley ("Berkley"), and Dimitri Davis ("Davis") in their individual and official capacities, and Corizon, LLC ("Corizon"). At all relevant times, Lewis, Berkley and Davis were nurses at the St. Louis City Criminal Justice Center ("CJC") and employed by Corizon. Plaintiff's action was originally filed in the Circuit Court of the City of St. Louis, Missouri on January 14, 2016 and removed to this Court on February 25, 2016. (Doc. No. 1) Plaintiff alleges Nurses Lewis, Berkley, and Davis were deliberately indifferent to his serious medical needs while he was confined at CJC. Specifically, Plaintiff alleges that despite being informed of his seizure disorder, Lewis delayed dispensing his anti-seizure medication, and Berkley and Davis ignored his complaints of an impending seizure and refused to give him his

---

[1] Plaintiff sought leave to file a sur-reply in opposition to Defendants' motion for summary judgment. (Doc. No. 52) Because the Court has considered the arguments made in this sur-reply, the Court is granting Plaintiff leave to file it.

medication. As a result, Plaintiff suffered a seizure and fell from the second floor of the CJC housing unit, fracturing his skull. Plaintiff further alleges that Corizon refused to provide him with his medical records in violation of R.S. Mo. § 191.227.1, thereby impairing his ability to properly evaluate his medical treatment while under Corizon's care, custody and control. (See Complaint ("Compl."), Doc. No. 2) Defendants move for summary judgment on the ground that Plaintiff cannot demonstrate they were deliberately indifferent to his serious medical needs.

## II.    Legal Standard

Summary judgment is appropriate when no genuine issue of material fact exists in the case and the movant is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988). If the record demonstrates that no genuine issue of fact is in dispute, the burden then shifts to the non-moving party, who must set forth affirmative evidence and specific facts showing a genuine dispute on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether summary judgment is appropriate in a particular case, the evidence must be viewed in the light most favorable to the nonmoving party. Osborn v. E.F. Hutton & Co., Inc., 853 F.2d 616, 619 (8th Cir. 1988). Self-serving, conclusory statements without support are not sufficient to defeat summary judgment. Armour & Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993).

## III.    Facts[2]

On July 2, 2012, at or about 8:54 p.m., Plaintiff was transferred from the Jennings Municipal Jail to CJC for confinement. Lewis was working as the medical intake screening nurse

---

[2] The facts are taken from Defendants' Statement of Uncontroverted Material Facts, Doc. No. 30, and Plaintiff's Statement of Genuine Issues of Material Facts, Doc. No. 44 at 2-15, and are undisputed unless otherwise stated.

on the midnight shift, from 11:00 p.m., July 2, 2012 to 7:00 a.m., July 3, 2012. At or about 12:26 a.m. on July 3, 2012, Lewis conducted a medical intake screening of Plaintiff to determine his fitness for confinement. For safety and security measures, the intake nurse takes possession of any prescription medications included with an inmate's personal items. If the prescription medication is found to be medically necessary, a physician with CJC will order it replaced with the same or similar medication from CJC's pharmacy. Among Plaintiff's personal items were 1,000 milligram tablets of an anti-seizure medication known as Keppra and prescribed by his private doctor to be taken twice daily. Plaintiff has a history of seizures and has been diagnosed with epilepsy. Lewis took possession of Plaintiff's Keppra during the medical intake screening.

It was Lewis's normal practice to contact the on-call physician near the end of her shift, between 6:00 a.m. and 6:30 a.m., to receive orders for replacement medications for newly processed inmates. Lewis would make an exception to this practice if she determined, based on her nursing experience and judgment, that an inmate had an immediate need for medication at that time. According to Plaintiff, he began shaking and sweating profusely during the intake screening and told Lewis he felt a seizure coming on. He asked Lewis for Keppra, but she did not provide him with his medication. Lewis disputes that Plaintiff exhibited any shaking, fidgeting, nervousness or profuse sweating, and states that had he complained to her about needing his medication, she would have notified the on-call physician for further instructions and made an entry to that effect in his medical chart. Similarly, if Plaintiff had told her he was experiencing the onset of a seizure, or exhibited symptoms of an impending seizure, she would have notified the St. Louis City Police Department to transport him to a local hospital, and made an entry to that effect in his medical chart. (Affidavit of Ruth Lewis (Lewis Aff."), Doc. No. 30-7 at ¶¶ 22, 25-27) The Medical Intake Screening Form does not indicate "sweating" or "tremors," and

Plaintiff's affect, mood, speech and activity was observed as appropriate. (Id. at 26-27) After completing Plaintiff's intake screening, Lewis advised CJC guards that Plaintiff had a history of seizures.[3] Nevertheless, Plaintiff was assigned to a cell on the second tier.

At the end of her shift, at approximately 6:25 a.m., July 3, 2012, Lewis advised Brenda Mallard, M.D., the on-call physician at CJC that night, that Plaintiff had a personal prescription for Keppra. Dr. Mallard replaced Plaintiff's prescription with Keppra from CJC's pharmacy and ordered that he receive 1,000 milligrams twice daily, during the 8:00 a.m. and 8:00 p.m. med-passes. It was acceptable practice at CJC that inmates receive their medication within one hour before and one hour after the scheduled time. Medical personnel dispensed the replacement-Keppra to Plaintiff at or about 8:00 a.m., July 3, 2012.

At approximately 8:45 p.m. on July 3, 2012, Plaintiff suffered a seizure as he exited his cell and fell from the second tier to the floor below, injuring his head. At the time of Plaintiff's fall, Berkley and Davis were working the evening shift, from 3:00 p.m. to 11:30 p.m. Berkley and Davis were summoned and responded to the scene of the fall and treated Plaintiff. Plaintiff asserts that throughout the day, Berkley and Davis ignored his complaints that his medical condition was worsening and refused to give him his medication. Berkley and Davis dispute any interaction with Plaintiff prior to his fall. Plaintiff was subsequently transferred to Saint Louis University Hospital for treatment. Since the fall, Plaintiff claims he has experienced frequent seizures, headaches, and neck and back pain.

---

[3] Lewis testified it was the practice of intake nurses to advise CJC guards of inmates with histories of seizures so those inmates could be assigned to lower bunks and first tier cells as a precautionary measure; however, the parties dispute whether there was an official institutional policy requiring such. In any event, there was no evidence that Corizon medical personnel were authorized to make cell assignments.

## IV.    Discussion

### A.  Official capacity claim[4]

Plaintiff sues Lewis, Berkley and Davis in their individual and official capacities. The official capacity claim against them is treated as a claim against Corizon. See Johnson v. Hamilton, 452 F.3d 967, 973 (8th Cir. 2006) (citing Sanders v. Sears Roebuck & Co., 984 F.2d 972, 975–76 (8th Cir. 1993), and holding that to "support a claim against" a private prison medical provider under § 1983, a prisoner "must show there was a policy, custom, or official action that inflicted an actionable injury"). Plaintiff does not allege that Lewis, Berkley and Davis have authority to set policies, practices, or customs on behalf of Corizon. Further, no evidence of record demonstrates the alleged delay in providing Plaintiff with anti-seizure medication was caused by a policy, practice, or custom of Corizon, or of Corizon's state affiliate, the Missouri Department of Corrections. Therefore, the official capacity claims fail as a matter of law. See Hamilton v. Grubbs, No. 4:14-CV-766-CEJ, 2017 WL 264511, at *3–4 (E.D. Mo. Jan. 20, 2017), appeal dismissed sub nom. Hamilton v. Gremminger, No. 17-2781, 2017 WL 7668597 (8th Cir. Dec. 20, 2017).

### B.  Deliberate indifference

The Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976); Davis v. Oregon Cnty., Mo., 607 F.3d 543, 548 (8th Cir. 2010). Deliberate indifference has both an objective and a subjective component. Jackson v. Buckman, 756 F.3d 1060, 1065 (8th Cir. 2014). The objective component requires a plaintiff to demonstrate an objectively serious medical need. Id. An objectively serious medical need is one that either has

---

[4] The Court notes that neither Plaintiff nor Defendants addressed the official capacity claim in their briefing.

been diagnosed by a physician as requiring treatment, or is so obvious that even a " 'layperson would easily recognize the necessity for a doctor's attention.' " Scott v. Benson, 742 F.3d 335, 340 (8th Cir. 2014) (quoting Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)).

Under the subjective component, a plaintiff must show the defendant actually knew of, but deliberately disregarded, his objectively serious medical need. McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009) (quotation marks and citation omitted). This is an extremely high standard that requires a mental state "akin to criminal recklessness." Jackson, 756 F.3d at 1065 (quoting Scott, 742 F.3d at 340). Thus, Plaintiff must show "more than negligence, more even than gross negligence" to establish deliberate indifference. Fourte v. Faulkner Cty., Ark., 746 F.3d 384, 387 (8th Cir. 2014) (quoting Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)).

Here, there is no dispute that Plaintiff had a seizure disorder, a serious medical need. Thus, this case turns on the subjective component of the deliberate indifference standard. In support of their motion, Defendants argue that Plaintiff has not presented any evidence that Berkley and Davis actually knew he had a history of seizures and needed Keppra. In fact, the only references to Berkley and Davis in the medical record pertain to their involvement in Plaintiff's medical care and treatment after his fall. (Doc. No. 30-1 at 8-11) Both deny any interaction with Plaintiff prior to his fall, and state that had Plaintiff complained to them during their shifts about an impending seizure, they would have notified a physician and made an entry to that effect in his medical chart. (Affidavit of Phyllis Berkley ("Berkley Aff."), Doc. No. 30-8 at ¶¶ 18-20; Affidavit of Dimitri Davis ("Davis Aff."), Doc. No. 30-9 at ¶¶ 16-18) Defendants also note that Plaintiff was unable to identify the nurses to whom he complained about his medication on July 3, 2012. (See Deposition of Gary Williams ("Williams Depo."), Doc. No. 30-6 at 25:19-26:19)

Plaintiff responds that this does not necessarily controvert whether Berkley and Davis knew about his history of seizures since this information was available on his medical chart, but

points to no evidence that his medical chart was available to Berkley and Davis. "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions" are not sufficient to defeat summary judgment. Morris v. City of Chillicothe, 512 F.3d 1013, 1018 (8th Cir. 2008) (internal punctuation and citation omitted). Because there is no evidence of record that demonstrates or permits a reasonable inference that Berkley or Davis knew about Plaintiff's history of seizures or were personally involved in his care and treatment prior to his fall, the Court concludes that, as a matter of law, Berkley and Davis are entitled to summary judgment on Plaintiff's deliberate indifference claim.

With regard to Lewis, Defendants argue that Plaintiff has not presented any evidence that she deliberately disregarded his medical needs by delaying receipt of his anti-seizure medication. A recent case involving an alleged delay in treatment of a seizure disorder, Esch v. Cty. of Kent, 699 F. App'x. 509 (6th Cir. 2017), is instructive. There, Stephen Stiles died of a seizure shortly after he was taken into custody on an outstanding warrant. Plaintiff Esch, Stiles' personal representative, alleged that an intake nurse, among other medical officials at the county jail where Stiles was being detained, caused his death through their failure to give him his anti-seizure medication in a timely manner. Stiles arrived at the jail at approximately 4:55 a.m. and was taken to a medical intake screening. The intake nurse noted that Stiles suffered from epilepsy, grand mal seizures, and hypertension, and was also under the influence of alcohol, which can exacerbate the risk of seizures. Stiles also told the intake nurse that he had had a seizure two weeks prior to his arrest. Stiles provided the nurse with the name of his treating physician and a phone number for his pharmacy so she could verify his prescription for an anti-seizure medication known as Dilantin. Stiles was prescribed to take Dilantin twice daily – once in the morning, and once in the evening. At the time Stiles entered the jail, he had not taken his

previous night's dose of Dilantin, but the nurse failed to ask him when he had last taken his medication. The nurse entered Stiles' information into the jail's computer system, and then placed his chart in a stack for the next duty nurse to review. The intake nurse's shift ended sometime between 6:00 a.m. and 7:00 a.m. The record showed that Stiles did not receive his medication until roughly fifteen hours later.

Based on these facts, the Sixth Circuit concluded that that no reasonable jury could find the nurse had acted unreasonably. Id. at 516-17. Although Stiles unquestionably suffered from a serious medical condition requiring treatment, and informed the nurse of his Dilantin prescription, the nurse was not aware of any facts suggesting he could not wait for the jail to complete its ordinary prescription verification procedures. During his intake screening, there was no sign that Stiles was in any acute medical distress requiring the nurse to depart from established jail procedures for verifying a prisoner's need for medication before dispensing it. Id.

Here, Lewis noted on the Medical Screening Form that Plaintiff had a seizure disorder. Unlike the nurse in Esch, she noted that Plaintiff had last taken his Keppra the previous day, July 2 (Doc. No. 27-1; Deposition of Ruth Lewis (Lewis Depo.), Doc. No. 30-3 at 22:9-23:22); however, she did not inquire about the time of day Plaintiff last took his medication. Nothing in Plaintiff's chart indicated that he complained to Lewis about symptoms signalling the onset of a seizure. (Lewis Aff. at ¶ 34) The Medical Screening Form does not reflect any symptoms of an impending seizure, such as shaking, fidgeting, and profuse sweating; no boxes were checked for "sweating" and "tremors" in the "Current Medical Conditions" section of the screening form. In fact, Lewis observed and charted Plaintiff's affect, mood, speech, and activity as appropriate. (Doc. No. 27-1; Lewis Aff. at ¶¶ 26-27) Based on her nursing experience and judgment, Lewis determined Plaintiff was fit for confinement and that there was no immediate need to contact the on-call physician prior to 6:00 a.m. for orders for replacement of his Keppra. (Lewis Aff. at ¶ 20)

Although Plaintiff disputes Lewis' observation that he displayed no outward signs of an impending seizure, "[m]ere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions" are not sufficient to defeat summary judgment. <u>Morris</u>, 512 F.3d at 1018.

In the Eighth Circuit, a similar case affirmed dismissal of an inmate's deliberate indifference claim. In <u>Campbell v. Hickman</u>, 109 F. App'x. 132 (8th Cir. 2004), the plaintiff missed his seizure medication two times, but produced no evidence showing defendants intentionally denied, or delayed obtaining, this medication. Notably, the plaintiff in <u>Campbell</u> testified that he usually had between one and three seizures a month even on his medication. Consistent with <u>Esch</u> and <u>Campbell</u>, the Court finds there is no evidence that Lewis deliberately disregarded Plaintiff's serious medical needs. Thus, Lewis is entitled to judgment as a matter of law with regard to Plaintiff's claim that she delayed or failed to provide him with his anti-seizure medication.

Further, when a delay in medical treatment is the alleged constitutional deprivation, as in this case, the objective seriousness of the deprivation is measured "by reference to the effect of delay in treatment." <u>Laughlin v. Schriro</u>, 430 F.3d 927, 929 (8th Cir. 2005) (quoting <u>Crowley v. Hedgepeth</u>, 109 F.3d 500, 502 (8th Cir. 1997)). Thus, to succeed on a delay in medical treatment claim, the plaintiff must offer "verifying medical evidence" that the delay – rather than the inmate's underlying condition – caused some degree of harm. <u>Id</u>.; <u>see also</u> <u>Robinson v. Hager</u>, 292 F.3d 560, 564 (8th Cir. 2002) (plaintiff did not offer any evidence that his lapse in hypertension medication, and not some other factor, caused him to suffer a stroke). In the absence of such evidence, the plaintiff fails to raise a genuine issue of fact on an essential element of his claim. <u>Jackson v. Riebold</u>, 815 F.3d 1114, 1119-20 (8th Cir. 2016).

The Eighth Circuit has upheld the entry of summary judgment where a plaintiff failed to submit verifying medical evidence that a delay in treatment adversely or detrimentally affected his condition or prognosis. In <u>Laughlin</u>, the Eighth Circuit upheld the entry of summary judgment in favor of prison officers and officials who delayed treating the inmate's heart attack where the inmate failed to offer evidence "establishing that any delay in treatment had a detrimental effect." <u>Laughlin</u>, 430 F.3d at 929. <u>See also</u> <u>Corwin v. City of Indep., Mo.</u>, 829 F.3d 695, 698 (8th Cir. 2016) (affirming grant of summary judgment where no medical evidence in the record to support the claim that a five-day delay in medical care for his injured hand caused inmate to suffer a detrimental effect); <u>Jackson</u>, 815 F.3d at 1119–20 (affirming grant of summary judgment where prisoner based claim on treatment delays for his heart attack but did not place verifying medical evidence in the record to establish detrimental effect of delay); <u>Dulany v. Carnahan</u>, 132 F.3d 1234, 1243 (8th Cir. 1997) (affirming summary judgment in favor of defendant prison officials where neither plaintiff submitted verifying medical evidence showing that delay in treatment of her acute cardiac condition and chest pain resulted in an adverse effect); <u>Crowley v. Hedgepeth</u>, 109 F.3d 500, 502 (8th Cir. 1997) (affirming summary judgment when the inmate did not submit verifying medical evidence that delay in providing the inmate with sunglasses following eye surgery had any adverse effect on his prognosis). <u>Compare Coleman</u>, 114 F.3d 778, finding an inmate who had given premature birth presented sufficient verifying medical evidence that a prison nurse had ignored critical or escalating situation or that nurse's delay in transferring inmate to hospital had posed substantial risk of serious harm, so as to support Eighth Amendment claim, in light of expert testimony that mother's urge to push during delivery process is an involuntary reaction, indicating that inmate had in fact been in labor, and that delay in inmate's treatment had posed substantial risk of serious harm.

Plaintiff claims he had last taken Keppra around 8:00 a.m. on July 2, 2012, and that because Lewis waited until the end of her shift on July 3, 2012 to call Dr. Mallard, he did not receive his medication until roughly 22 hours later. Defendants argue that Plaintiff has provided no verifying medical evidence that missing one dose of Keppra caused him to have a seizure, or that his head injury caused his current medical conditions of frequent seizures, headaches and neck and back pain. Defendants offer the affidavit of Brenda Mallard, M.D., the Corizon physician involved in Plaintiff's medical care and treatment on July 3, 2012. (Affidavit of Brenda Mallard ("Mallard Aff."), Doc. No. 30-10) Dr. Mallard states, based on her professional training and experience in internal medicine, that although Keppra is an anti-seizure medication, it does not prevent seizures, but only reduces the incidence of seizures. (Id. at ¶ 20) A person may still experience a seizure while taking Keppra as prescribed, and the failure to take a dose of Keppra at the time prescribed does not necessarily mean that an individual will experience a seizure as a result of missing that dose. (Id. at ¶¶ 21-22) According to Dr. Mallard, even if Plaintiff had been provided with Keppra on the morning of July 3, 2012, there was no guarantee he would not have experienced a seizure later than evening. (Id. at ¶ 23) Indeed, Plaintiff testified on deposition that he had had seizures prior to his arrest on July 2, 2012 while on anti-seizure medication. (Williams Depo., Doc. No. 30-6 at 8:8-19) Likewise, Lewis, Berkley and Davis all state they have cared for patients who were compliant with their Keppra medication yet still experienced seizures, and treated patients who missed a dose of Keppra without later experiencing seizures. (Lewis Aff. at ¶¶ 23-24; Berkley Aff. at ¶¶ 21-24; Davis Aff. at ¶¶ 20-22)

Plaintiff counters with the testimony of Raymond Rickets, R.N., a former charge nurse at CJC, and an affidavit from his treating physician, Daniel Mattson, M.D.[5] Rickets testified on deposition that when he last worked at CJC in 2006, it was his understanding that individuals with seizure disorders were to be placed in lower bunks on lower tiers. Rickets further testified an intake nurse should always ask when the inmate had last taken his/her medication so they know when the next dose is due, because if medication is not taken as prescribed, and in particular Keppra, "it's going to cause a problem," namely a seizure.

The Court has reviewed the pleadings and finds no allegations of deliberate indifference on the part of Defendants with regard to Plaintiff's assignment to a second-tier cell.[6] Thus, Rickets' proffered testimony appears to be outside the scope of the complaint. While Rickets is arguably in a position to indicate which actions or inactions contravene CJC protocol for distribution of medication, he is not automatically qualified as an expert to testify that a missed dose of Keppra will cause a seizure. See Elswick v. Nichols, 144 F. Supp.2d 758, 767 (E.D. Ky. 2001) (nursing expert cannot testify as to how plaintiff received infection because it was "outside [her] area of expertise"); see also Earp v. County of Tulare, No. 1:11-CV-0196-MJS (PC), 2012 WL 1076217, at *4 (E.D. Cal. Mar. 29, 2012) (nurse not competent to opine on the medical causation issues raised in deliberate indifference case).

Dr. Mattson opines that Plaintiff's delay in receiving his Keppra medication *could have* caused his seizure on July 3, 2012, and that the seizure and subsequent fall on July 3, 2012 *could also be* a factor in the flurry of seizures he has suffered since that date. (Mattson Aff., Doc. No.

---

[5] Defendants have challenged the admissibility of this evidence; however, because the Court finds it insufficient, it need not address Defendants' motion to strike Rickets as Plaintiff's non-retained expert (Doc. No. 31) or the affidavit of Dr. Mattson (Doc. No. 50 at 7).

[6] As discussed below, any claim related to cell assignments would fail as to these Defendants because cell assignments are not made by Corizon employees.

44 at 22-24, ¶¶ 13-14 (emphasis added). Because Mattson cannot state with medical certainty that the delay in medication caused Plaintiff to have a seizure, Plaintiff has failed to meet his burden to demonstrate a genuine issue of material fact about whether Defendants were deliberately indifferent to his serious medical needs, or that the claimed delays had any detrimental effect on his condition or prognosis. Dykes v. Mitchell, No. 4:07-CV-733 CAS, 2009 WL 1490556, at *8–9 (E.D. Mo. May 27, 2009) (citing Laughlin, 430 F.3d at 929).

Plaintiff concedes that his medication was no guarantee he would not have seizures – or that missing it was no guarantee that he would (Doc. No. 44 at 20), but contends there is a genuine issue of material fact concerning the causation of his seizure. Plaintiff overlooks the fact that he has the burden of proof to show causation between the alleged acts and the alleged damage. Robinson v. Hager, 292 F.3d 560 (8th Cir. 2000). Because Plaintiff fails to offer any verifying medical evidence showing Defendants' actions caused him to suffer a seizure, the Court concludes that he has failed to raise a genuine issue of fact on an essential element of his claim and no reasonable juror could find in his favor. Accordingly, summary judgment will be granted in favor of Defendants.

In his opposition to Defendants' motion for summary judgment, Plaintiff raises a claim not pled in his petition, namely that Defendants' failure to ensure him a ground floor placement constituted deliberate indifference to his medical needs. The liberal pleading standard under the Federal Rules does not afford a plaintiff an opportunity to raise new claims at the summary judgment stage. See Falco v. Farmers Ins. Grp., 795 F.3d 864, 868 n.4 (8th Cir. 2015) ("[W]hile we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment.") (quoting Northern States Power Co. v. Fed.

Transit Admin., 358 F.3d 1050, 1057 (8th Cir. 2004)); see also Winfrey v. City of Forrest City, Ark., 882 F.3d 757 (8th Cir. 2018) (where police officer brought Title VII retaliation claim that was based on a pay dispute unrelated to issues of race or gender discrimination, he could not submit an affidavit in opposition to summary judgment claiming his dismissal was race based); Cofer v. Schriro, 17 F. App'x. 504 (8th Cir. 2001) (unpublished per curiam) (claim raised for the first time in opposing summary judgment was not properly before the district court). At the summary judgment stage, the proper procedure for a plaintiff to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend his complaint through argument in a brief opposing summary judgment. WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co., 231 F. Supp. 3d 313, 318 (W.D. Mo. 2017) (internal citations omitted). However, even if the Court were to address Plaintiff's new claim, it would not preclude summary judgment for Defendants because Corizon medical personnel were not responsible for assigning inmates to cells.

### C.  State law claim

Plaintiff's state law claim is that Corizon violated R.S. Mo. § 191.227.1 by wrongfully withholding his medical records. Plaintiff alleges that on May 2, 2013, his counsel submitted written requests to Corizon for copies of his medical records. He further alleges that on April 10, 2015, Corizon refused to furnish him with his medical records, thereby impairing his ability to properly evaluate his medical treatment while under Corizon's care, custody and control. (Compl. ¶¶ 20-25)

When all federal claims are dismissed before trial, it is within the Court's discretion to retain supplemental jurisdiction over any remaining state law claims for which jurisdiction does not otherwise exist. 28 U.S.C. § 1367(c)(3). Although a general preference exists to decline

jurisdiction over state law claims, a district court should consider and weigh several factors in determining whether to retain jurisdiction over state law claims, including "judicial efficiency, convenience, and fairness to the litigants." Condor Corp. v. City of St. Paul, 912 F.2d 215, 220 (8th Cir. 1990). The Court finds there are factors that weigh in favor of retaining supplemental jurisdiction over Plaintiff's state law claim. The action has been pending for over two years and has a trial date set. The action has proceeded past the discovery stage, and the period for filing dispositive motions under the current scheduling order has concluded. The pending motion for summary judgment is directed at all claims in the action and seeks a final judgment. It would appear to be a needless and inefficient use of resources for the state law claim to be moved from this Court to a state forum given the current posture of the lawsuit.

Section 191.227 generally requires health care providers to provide a patient's medical records upon the patient's written request; whereas § 217.075 specifically addresses the Department of Correction's duty to provide such records to inmates.[7] "When the same subject matter is addressed in general terms in one statute and in specific terms in another, the more specific controls over the more general." Lockhart v. Hallazgo, 983 S.W.2d 577, 578–79 (Mo. Ct. App. 1998) (quoting Greenbriar Hills Country Club v. Director of Revenue, 935 S.W.2d 36 (Mo. banc 1996)). Section 217.075 clearly applies to prisoners as a separate and distinct class and modifies any general statute to the contrary, including § 191.227. Id. The fact that Corizon is

---

[7] Section 217.075 states as follows:

1. All offender records compiled, obtained, prepared or maintained by the department or its divisions shall be designated public records within the meaning of chapter 610, RSMo, except:

(1) Any information, report, record or other document pertaining to an offender's personal medical history, which shall be a closed record;
. . .
2. The court of jurisdiction, or the department, may at their discretion permit the inspection of the department reports or parts of such reports by the offender, whenever the court or department determines that such inspection is in the best interest of the offender.

a contract provider does not alter the conclusion that the records are those of the Department of Corrections. Id. Because it is undisputed that Plaintiff is a prisoner, § 217.075 controls. Summary judgment should be granted to Corizon on this claim because Plaintiff has no standing to sue under § 191.227. See Lockhart, 983 S.W.2d at 578 (prisoner must sue for medical records under more specific statute, § 217.075, and not more general one concerning patient records).

## V. Conclusion

In sum, the Court finds that Defendants have established their entitlement to summary judgment as to Plaintiff's claims against them. Plaintiff has not established that Defendants Lewis, Berkley and Davis were deliberately indifferent to his serious medical needs or that any delay in treatment caused or had a detrimental effect. Furthermore, Plaintiff lacks standing to sue Corizon under R.S. Mo. § 191.227.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [28] is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Plaintiff's Non-Retained Expert [31] is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to File Sur-Reply [52] is **GRANTED**.

**IT IS FINALLY ORDERED** that Plaintiff's Motion for an Order Referring Case to Mediation [59] is **DENIED** as moot.

A separate Judgment will accompany this Memorandum and Order.

Dated this 3rd day of July, 2018.

**JOHN A. ROSS
UNITED STATES DISTRICT JUDGE**